IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| AMBER JERNIGAN and TAYLOR JERNIGAN, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. Act. No.: 2:17-cv-44-ECM (WO) |
| CITY OF MONTGOMERY, ALABAMA, et al., | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

Now pending before the Court is a motion for summary judgment filed on March 2, 2018 by Defendants City of Montgomery ("the City") and Jeremy Browning ("Browning"). (Doc. 11).

The Plaintiffs, Amber Jernigan and Taylor Jernigan ("the Jernigans"), originally filed a complaint in this case on January 23, 2017, bringing claims of outrageous conduct, false imprisonment, and false arrest (count one) and deliberate indifference (count two). In response to the motion for summary judgment, the Jernigans have clarified that they intend to bring claims of false arrest/false imprisonment under the Fourth Amendment pursuant to 42 U.S.C. § 1983 against Browning individually; state law claims for false arrest/false imprisonment against Browning and the City; a claim of negligent training

against the City; and a fourteenth amendment deliberate indifference failure to train claim against the City. (Doc. 19 at 9 & 18, n.5).[1]

Upon consideration of the briefs, evidence, and applicable law, and for the reasons that follow, the motion for summary judgment is due to be GRANTED as to the federal claims and the Court will decline to exercise jurisdiction over the state-law claims.

### I. JURISDICTION

The Court can exercise subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1367. Personal jurisdiction and venue are uncontested.

### II. LEGAL STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "[A] court generally must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016). However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*,

---

[1] The Jernigans also state in a footnote in their brief that summary judgment cannot be granted as to their hostile work environment claim. (Doc. 19 at 21, n.7). This argument appears to have been an error, as there are no facts in this case to support that the Plaintiffs were in any way employed by the City.

891 F.3d 911, 924–25 (11th Cir. 2018). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that a genuine issue of material fact exists. *Id.* at 1311–12.

### III. FACTS

The facts, taken in a light most favorable to the non-movants, are as follows:

On January 23, 2016, the Jernigans, who are a married couple, were home with their four-year-old daughter. Defendant Browning, a police officer with the City, came to their home and asked to speak with Taylor Jernigan. Taylor Jernigan was in the shower but dressed and stepped outside to speak to Browning. (Doc. 18-1 at 2). Browning told him to turn around and put his hands behind his back because Browning had a warrant for his arrest. (Doc. 18-1 at 2). Taylor Jernigan was handcuffed. (Doc. 18-1 at 2). Browning said that a warrant had been sworn out for harassment for Taylor and Amber Jernigan. (Doc.

18-1 at 2-3). When Taylor Jernigan inquired, Browning confirmed that he was also arresting Amber Jernigan. (Doc. 18-1 at 3). Amber Jernigan arranged for childcare for their daughter, and when her grandfather arrived to care for the child, the Jernigans were taken to Browning's police vehicle. (Doc. 18-1 at 4). Amber Jernigan was also placed in handcuffs. (Doc. 18-1 at 4). The Jernigans were placed in the rear of the patrol vehicle. (Doc. 18-1 at 4).

Browning has stated in a deposition that he had done an outstanding warrant inquiry on the computer in his car and discovered what he assumed were warrants outstanding on both Jernigans. (Doc. 11-1 at 13: 21-15: 10).[2] He explained that his field training officer trained him that the list on the computer was for misdemeanors and felonies. (Doc. 11-1 at p. 18: 13-16). Browning stated in his deposition that he was not aware that summonses could be on the list. (Doc. 11-1 at 18: 18-20). Browning also stated the case number for the Jernigans was 216S00015, and that the "S" stands for "summons," which he would have known if had he been trained that the "S" stood for "summons." (Doc. 11-1 at 19: 10-20: 3). He further stated that he does not recall whether he received training as City of Montgomery police department patrolman on what a summons was. (Doc. 18-2 at 20:19-21:4).

The Jernigans sat in the back of the police vehicle for nearly forty minutes. (Doc. 18-1 at 4). Browning then received a radio call and discovered that the Jernigans had

---

[2] In citing deposition excerpts, the court has used the CMECF document number, but the deposition's internal page and line numbering.

summonses, not warrants, against them. (Doc. 18-1 at 4). Browning released the Jernigans and the summonses were eventually dismissed. (Doc. 18-1 at 5).

## IV. DISCUSSION

The Court will separately address the federal and state law claims, beginning with the basis for summary judgment motion as to the federal claims.

**A. Federal Claims**

1. Fourth Amendment Claim Against Browning Individually

The Defendants have moved for summary judgment as to the federal claim asserted against Browning on the basis of qualified immunity. Qualified immunity protects government officials from suit if they are "performing discretionary functions" and "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

    a. Discretionary Function

The Jernigans argue that Browning was not acting within his discretionary authority when he arrested them because under Alabama law a police officer is not allowed to arrest someone based on a summons.

In examining the discretionary authority issue, courts ask whether the government employee was (a) performing a legitimate job-related function, (b) through means that were within his power to utilize. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265

(11th Cir. 2004). The question is not whether the official acted lawfully. *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir.1998).[3] Instead, the issue is whether "the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Id.* (citation omitted).

In this case, the Jernigans contend that they were unlawfully arrested. Regardless of whether an arrest was lawfully performed, executing an arrest is within the scope of the discretionary duties of a police officer. *See, e.g., Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002) (stating, "there can be no doubt that Ferraro was acting in his discretionary capacity when he arrested Lee."); *see also Strickland v. City of Dothan*, *AL*, 399 F. Supp. 2d 1275, 1286 & n.23 (M.D. Ala. 2005) (noting that officer was on duty, in uniform, driving a marked patrol vehicle, and working her regular shift as a patrol officer when she stopped the car and made an arrest, so her acts were within the scope of her discretionary authority), *aff'd sub nom. Strickland v. Summers*, 210 F. App'x 983 (11th Cir. 2006).

---

[3] The court notes that in the context of opposing summary judgment on the state-law claim on the basis of state-law immunity, the Jernigans have cited *Telfare v. City of Huntsville*, 841 So. 2d 1222, 1229 (Ala. 2002), for the proposition that Alabama law does not allow law-enforcement officers the discretion to arrest alleged wrongdoers for misdemeanors not committed in the presence of the arresting officer. While federal district courts are to look to the decisions of the highest court of the state in deciding whether there is a clearly established violation of the law, a decision on the application of state immunity does not inform the federal qualified immunity inquiry on whether there was a discretionary function. *See Courson v. McMillian*, 939 F.2d 1479, 1498 n.32 (11th Cir. 1991) (noting "that clearly established law in this circuit may include court decisions of the highest state court in the states that comprise this circuit as to those respective states, when the state supreme court has addressed a federal constitutional issue that has not been addressed by the United States Supreme Court or the Eleventh Circuit."); *see also Lewis v. City of Montgomery*, 2006 WL 1761673, at *6, n.2 (M.D. Ala. 2006) (stating "a finding regarding state-agent immunity would not necessarily inform this Court's analysis of qualified immunity).

Therefore, Browning has established that the defense of qualified immunity may apply to his actions, depending upon the resolution of the remaining qualified immunity analysis.

      b. Violation of a Federal Right

Determining whether a defendant is entitled to qualified immunity requires a two-pronged inquiry. The first prong is whether the facts, "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right [.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In the context of a false arrest claim, "a warrantless arrest without probable cause violates the Constitution and forms the basis for a section 1983 claim." *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990).

The Jernigans argue that Browning made a warrantless arrest for a misdemeanor harassment offense not committed in his presence, violating the fourth amendment. The Defendants argue in response that Browning only detained[4] the Jernigans long enough to verify his understanding that there were outstanding warrants for their arrest, and that he released them upon determining that there were no active warrants.

The Court turns first to the nature of the detention of the Jernigans. The test for whether an arrest occurred is whether the suspect is "subjected to restraints comparable to those associated with a formal arrest." *United States v. Acosta*, 363 F.3d 1141, 1149 (11th Cir. 2004). In determining whether a seizure is an arrest or stop, courts consider the

---

[4] The Defendants' position on this point is somewhat unclear. In their initial brief, the Defendants state both that neither Plaintiff was placed under arrest (Doc. 12 at 4) and that both Jernigans were taken "into custody." (Doc. 12 at 3-4).

following four non-exclusive factors: (1) the law enforcement purposes served by the detention; (2) the diligence with which the police pursued their investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention. *Id.* at 1146 (quotation and citations omitted). While the use of handcuffs or placing a suspect in a patrol car do not necessarily transform a detention into an arrest, restriction of movement is a factor to be taken into account in evaluating the reasonableness of steps taken to ensure safety. *Id.* at 1147.

The facts, viewed in a light most favorable to the Jernigans, are that Browning put the Jernigans in handcuffs, that they were placed in the police car, that they were held in the car for forty minutes, and that they were told that they were being arrested. Considering the relevant factors, and considering a lack of any evidence that handcuffs and placement in the patrol car were necessary for officer safety, the Court concludes that the amount of restriction of movement, the nearly forty-minute detention, and that the Jernigans were told they were being arrested support a finding that the Jernigans were subjected to a custodial arrest. *See id.* at 1146-47. Under the facts viewed in a light most favorable to the non-movants, the arrest of the Jernigans was without a warrant and without probable cause and, therefore, was a violation of the fourth amendment. *See Marx*, 905 F.2d at 1505.

### c. Clearly Established Law

The second prong of the qualified-immunity analysis asks whether the violation of the federal right was "clearly established" at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). When examining caselaw to determine whether a violation is clearly

8

established, courts in the Eleventh Circuit look to decisions of the United States Supreme Court, the Eleventh Circuit, and the highest court of the pertinent state. *Marsh v. Butler County*, 268 F.3d 1014, 1032–33, n.10 (11th Cir. 2001).

In the context of a false arrest claim, "the dispositive question is whether it was already clearly established, as a matter of law, that at the time of Plaintiff's arrest, an objective officer could not have concluded reasonably that probable cause existed to arrest Plaintiff under the particular circumstances Defendants confronted." *Gates v. Khokhar*, 884 F.3d 1290, 1303 (11th Cir. 2018), *cert. denied*, __ U.S. __, 139 S. Ct. 807 (2019). Officers who make an arrest without probable cause "are entitled to qualified immunity if there was arguable probable cause for the arrest." *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the [defendant] could have believed that probable cause existed to arrest." *Gates,* 884 F.3d at 1298.

In evaluating the information known to Browning, the Court notes that the Jernigans contend that there is evidence to undermine Browning's version of the events. The Jernigans point to the deposition testimony of Officer J.E. King in which he states that when summonses are issued, the summonses do not go to the police officers but go to the police department and are kept in a separate room in the records section of the police department. (Doc. 18-4 at 13-15). The Jernigans argue, based on that testimony, that Browning's version of the events cannot be accepted because summonses in fact do not appear on the computer in patrol cars. (Doc. 19 at 11-12).

9

The Defendants respond that King's testimony concerns actual paper summonses and does not address the records listed on the computer in the patrol car.[5] Upon review of the testimony cited by the Jernigans, the Court finds that King's deposition testimony does not address in any way what information is contained in the computer system and displayed in patrol cars. The evidence cited by the Jernigans, therefore, is not sufficient to call into question Browning's testimony that there was a listing of the summonses—which he thought was a warrant—on his patrol computer. (Doc. 11-1 at 14: 7-17). Accordingly, the Court concludes that the unrefuted evidence in the record is that Browning arrested the Jernigans based on his mistaken understanding that the listing on his computer was of warrants for arrest. *Cf. Kingsland*, 382 F.3d at 1228 (stating that the court "cannot allow a probable cause determination to stand principally on the unsupported statements of interested officers, when those statements have been challenged *and countered by objective evidence*.") (emphasis added).

Browning's mistake was one of fact. The protection of qualified immunity can apply regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

---

[5] In support of their rebuttal to the Jernigans' argument, Defendants also provide the deposition of Brian Champlin in which he states that Browning learned of the summons from his police resources which include the MOVE software that officers use in the car. (Doc. 20-1 at 14: 1-13).

This Court is not aware of any binding caselaw which has found unlawful an arrest where an officer mistakenly thinks a warrant has been issued for a person's arrest based on his understanding of the information he reviewed, but instead only a summons has issued. *See Gates*, 884 F.3d at 1303 (stating, "Plaintiff does not cite, and we have not found, any already existing law that clearly established—beyond debate—the unlawfulness of an arrest under the circumstances present here.").

In addition, this Court finds analogous those decisions which have found that officers are entitled to qualified immunity when they rely on other officers in detaining or arresting suspects. The Supreme Court has addressed reliance on information of other officers in *United States v. Hensley*, 469 U.S. 221, 232 (1985). In that case, officers performed a stop relying on another jurisdiction's issuance of a flyer stating that there was a reasonable suspicion that the suspect had committed the offense. *Id.* The Supreme Court explained that "[i]f the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment. In such a situation, of course, the officers making the stop may have a good-faith defense to any civil suit." *Id.* In *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971), the Supreme Court explained that "[c]ertainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause."

Applying *Hensley* and *Whiteley*, another judge of this district has reasoned that when a law enforcement official "reasonably relies on information received from fellow

officers in deciding to arrest a suspect, the relying officer is not subject to civil liability if it later turns out that the information was wrong, and the arrest not supported by probable cause." *Williams v. Town of White Hall, Alabama*, 450 F. Supp. 2d 1300, 1305 (M.D. Ala. 2006) (Thompson, J.). Another judge of this district similarly evaluated an argument by a plaintiff that her decedent had been arrested by mistake because the arresting officers relied on erroneous information that there were outstanding warrants for his arrest. *Lewis v. City of Montgomery*, 2006 WL 1761673, at *6 (M.D. Ala. 2006) (Watkins, J.). The court reasoned that the plaintiff had pointed to no authority that officers are required to double-check their information after being contradicted by a member of the arrestee's family, and found arguable probable cause, entitling the officers to qualified immunity. *Id.* The First Circuit also applied *Hensley* in finding a violation of the fourth amendment where a woman was detained for whom the officer mistakenly believed an arrest warrant had issued but held that the officer was entitled to qualified immunity because the officer was reasonable in believing that a warrant existed under the facts. *See Wilson v. City of Boston*, 421 F.3d 45, 57-9 (1st Cir. 2005).[6]

In this case, Browning mistakenly assumed that there was a warrant for the Jernigans' arrest when he saw the Jernigans' names in a computer program in his patrol car. He came to this conclusion because he was relying on the training from his field officer that the information listed by the computer program was a listing of warrants. (Doc. 18-2 at p. 21: 13-21). Under these unrefuted facts, the Court concludes that the decision to

---

[6] The Court has considered these decisions as persuasive authority in interpreting Supreme Court precedent and not as cases which could clearly establish the law in the Eleventh Circuit.

arrest, albeit a decision based on a mistake of fact, was made in reasonable reliance on information from another officer.[7] Qualified immunity, therefore, is due Browning and the motion for summary judgment will be granted as to the federal claims against him.

    2. Deliberate Indifference Failure to Train Claim Against the City

Although the Jernigans appear to contend that they have brought a separate deliberate indifference claim against the City, the arguments and cases cited by the Jernigans demonstrate that they actually rely on their deliberate indifference theory in an attempt to hold the City liable for Browning's actions. (Doc. 19 at 23-25) (arguing the City's failure to train Browning was the cause of the Plaintiffs' injury).

"A municipality is not automatically liable under Section 1983 even if it inadequately trained or supervised its employees and those employees violated plaintiff's constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). "[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Knight through Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 820 (11th Cir. 2017). Instead, the failure to train must be a city policy. *Gold,* 151 F.3d at 1350. Because there rarely is a written policy of inadequately training

---

[7] The Jernigans also make the argument that Browning could not have been acting in good faith because he arrested the Jernigans before he attempted to verify that there was a warrant. While the facts of the circumstances of Browning taking the Jernigans into custody include the time spent verifying the warrants, Browning's decision to verify does not bear on whether his reliance on the information on the computer screen in making the initial arrest was reasonable. *Cf. Lewis v. City of Montgomery*, 2006 WL 1761673, at *6 (M.D. Ala. 2006) (finding plaintiff had pointed to no authority that officers are required to double-check their information when called into question by a family member).

employees, a plaintiff may prove a policy by showing that a failure to train "evidenced a 'deliberate indifference' to the rights of its inhabitants." *Id.* To establish deliberate indifference, a plaintiff must "present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.*

"That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390–91 (1989). There must be a "glaring omission," not merely an "imperfection" in the training program. *Gold*, 151 F.3d at 1352 (citation omitted).

A city's notice that there is a need to train is usually established with evidence of a widespread pattern of similar constitutional violations by untrained employees. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). The Jernigans do not attempt to rely on this form of notice.

Instead, the Jernigans rely on a form of notice first mentioned by the Supreme Court in dictum in *City of Canton*. The Supreme Court stated that based on the duties of specific officers, it may be that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the city can reasonably be said to have been deliberately indifferent to the need. *City of Canton,* 489 U.S. at 390. The Court gave only one example, i.e., that cities know to a moral certainty that the police will be required to arrest fleeing felons, and give them firearms for that task, so "the need to train officers in the constitutional limitations on the use of deadly force,"

can be said to be " 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* at 390 & n.10.

The Jernigans' argument is that the City completely failed to train Browning on how to handle a summons and a warrant and this lack of training caused a violation of their constitutional rights. (Doc. 19 at 23) (stating "It is obvious that executing summons and warrants are a large and important part of an officer's job. In this situation, this evidence not does simply point to inadequate training, rather the evidence points to a complete lack of training on a very important issue; . . . [which] is directly responsible for the injury suffered by the plaintiffs.").

The evidence pointed to by the Jernigans, however, does not support that there was a complete lack of training. In his deposition, Browning stated that he was planning to arrest the Jernigans because he was under the assumption that they had arrest warrants. (Doc. 11-1 at 18: 6-10). When asked why he made that assumption he answered, "I was trained by my field training officer that the list on the mobile program was only for misdemeanors and felonies." (Doc. 11-1 at 18: 13-6). When asked whether he had ever received training on what a summons was, Browning said, "not to my recollection," but agreed that he could have been trained, he just did not recall it. (Doc.18-2 at 20: 19-21: 4).

The evidence before the Court, therefore, is that Browning received training about what was reflected on the computer in his police vehicle but was incorrectly told in this training that the information included warrants and was not told that summonses could also be included. (Doc. 18-2 at 21: 13-17). These facts do not fit a theory that the officer received no training and, therefore, are distinguishable from the example in the *City of*

15

*Canton* footnote. 489 U.S. at 390 & n.10 (identifying a failure "to train officers" in the limitations on the use of deadly force). More fundamentally, however, the Court concludes that the facts of this case fall outside of the narrow range of circumstances where the need for training is "so obvious" that a failure to adequately train can be deliberate indifference. *See id.* at 390.

The Eleventh Circuit had adhered to a narrow view of *City of Canton* in a series of decisions. *See Gold*, 151 F.3d at 1352 (noting a characterization of *City of Canton* as hypothesizing only a "narrow range of circumstances."). The Eleventh Circuit rejected that the identification and treatment of mentally ill inmates by jail staff is sufficiently obvious to provide notice. *See Young v. City of Augusta, Ga.*, 59 F.3d 1160, 1172 (11th Cir. 1995). In *Gold*, the Eleventh Circuit determined that the need to train on the proper response to handcuff complaints was not so obvious as to put the municipality on notice that training is required. 151 F.3d at 1352. And, in *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009), the Eleventh Circuit concluded that the application of a hobble does not rise to the requisite level of obviousness.

In *Borton v. City of Dothan*, 734 F. Supp. 2d 1237, 1256 (M.D. Ala. 2010) (Watkins, J.), a judge of this district interpreted the Eleventh Circuit's cases as expressing a "clear reluctance to extend failure-to-train liability," and concluded that an extension of the failure-to-train liability to include training on proper techniques to restrain mentally impaired individuals is not justified. Another judge of this district has similarly concluded that fabrication of evidence by officers is not within the "narrow" category of cases in which "the likelihood for constitutional violation is so high that the need for training would

16

be obvious." *Petkovich v. City of Montgomery, Ala.*, 2015 WL 263391, at *4 (M.D. Ala. 2015) (Albritton, J.).

Upon review of these cases, this Court is persuaded that the proper handling of summonses by police falls outside of the narrow range of cases in which the need for training is "so obvious" that training is required even in the absence of notice of prior constitutional violations. *Gold*, 151 F.3d at 1352. Therefore, because there is no evidence of notice of prior constitutional violations in this case, the Court cannot conclude that the Jernigans have established a basis of liability on the part of the City for a violation of federal law. *See Mingo v. City of Mobile, Ala.*, 2013 WL 6094674, at *15 & n. 11 (S.D. Ala. 2013), *aff'd,* 592 F. App'x 793 (11th Cir. 2014) (finding no municipal liability where there was no obvious need for training and "the undisputed evidence indicates that City police officers receive at least some training on the use of restraints and interacting with the mentally ill."). Accordingly, summary judgment is due to be GRANTED as to the City on the Jernigans' federal claims.

### B. State-Law Claims

Where all federal claims are dismissed prior to trial, district courts are encouraged to dismiss any remaining state-law claims. *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004). Before dismissing the remaining state-law claims, the Court must consider the factors of judicial economy, convenience, fairness, and comity. *See Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 537 (11th Cir. 2015).

"Both comity and economy are served when issues of state law are resolved by state courts." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002). "Federal courts are (and should be) loath to wade into uncharted waters of state law, and should only do so when absolutely necessary to the disposition of a case." *Ameritox*, 803 F.3d at 540. Indeed, the Supreme Court has declared that "[n]eedless decisions of state law should be avoided as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). In this case, there are state-law immunity issues which are best resolved by the state courts. Further, there is nothing before the Court to suggest that the remaining factors—convenience and fairness—weigh in favor of retaining subject-matter jurisdiction. Moreover, the Court can discern no possibility of significant prejudice to any party, particularly in light of § 1367(d)'s provision tolling the statute of limitations on any of the state-law claims. *See* 28 U.S.C. § 1367(d). Accordingly, the Court declines to exercise supplemental jurisdiction over the state-law claims pursuant to § 1367(c)(3).

V. **CONCLUSION**

For the reasons discussed, it is hereby ORDERED as follows:

1. The Motion for Summary Judgment is GRANTED as to the federal claims, and judgment will be entered against the Plaintiffs and in favor of Jeremy Browning and the City of Montgomery on those claims.

2. The Court declines to exercise supplemental jurisdiction over the state-law claims in this case pursuant to 28 U.S.C. § 1367 (c) and the state-law claims will be dismissed without prejudice.

A separate Final Judgment will be entered in accordance with this Memorandum Opinion and Order.

Done this 26th day of August, 2019.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE